UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **RANDOLPH HALLMON,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**UNITED NETWORK FOR ORGAN SHARING; THE MEDICAL UNIVERSITY OF SOUTH CAROLINA, and DR. VINAYA RAO,**<br><br>**Defendants.** | Case No.     2:24-cv-04100-DCN<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Randolph Hallmon ("Mr. Hallmon") brings this Complaint against the United Network for Organ Sharing ("UNOS"); the Medical University of South Carolina ("MUSC"), and Dr. Vinaya Rao (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1. For more than two decades, UNOS and its affiliated transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist and resulted in Black candidates waiting much longer for kidney transplants than similarly situated non-Black candidates.

2. Use of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than non-Black Americans; i.e., they relied on a defunct, eugenics-style racial stereotype.

3. Making medical policy based on racial stereotypes harmed all Black Americans

1

waiting for a kidney. This lawsuit focuses on one of them—Mr. Randolph Hallmon.

4. After receiving a technical education, Mr. Hallmon started a career as a machinist. He worked overseas for over a decade for Haliburton Company / KBR Inc. and eventually earned a six-figure salary. He takes great pride in his years of hard work.

5. Mr. Hallmon was first diagnosed with kidney disease in 2016, and at that time, he was not able to continue his fulfilling career overseas. He was forced to obtain a lower-paying job in South Carolina after the diagnosis to support his wife and daughter.

6. Eventually, Mr. Hallmon's kidney disease worsened to the point where, in 2020, he began dialysis. Dialysis made it very challenging to maintain a normal life. After beginning dialysis, Mr. Hallmon, with difficulty, continued working 12-hour shifts as an hourly employee. However, he had to return home every night to begin his dialysis treatment at 6:00 PM, until he had to leave for work the next day at 4:00 AM. Being forced to do dialysis every evening caused Mr. Hallmon to miss out on spending valuable time with his wife and daughter.

7. Eventually, dialysis was simply too demanding. Mr. Hallmon could no longer lift more than forty pounds, which made his job difficult. He lost weight and stamina.

8. Additionally, Mr. Hallmon began to experience painful cramping that caused him to take unexpected breaks at work and wake up screaming in pain during the night.

9. From the moment he went on dialysis, Mr. Hallmon experienced emotional worry and stressed about his future. As a result, he experienced depression.

10. Beginning in 2020, Mr. Hallmon was on the kidney waitlist at MUSC—biding his time and nursing his health until the hospital could find a match.

11. The source of all of these physically and mentally traumatizing events was Defendants' use of the race-based coefficient to taint Mr. Hallmon's eGFR scores.

12. Defendants UNOS and MUSC now admit these scores were artificially adjusted in a racist manner from the beginning.

13. In June of 2022, UNOS admitted that the use of a race-based coefficient for Black Americans was racially discriminatory. Thereafter, UNOS approved "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[1]

14. Despite prohibiting future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist.

15. In January of 2023, UNOS instructed donor hospitals, including MUSC, to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait-time modification, but UNOS gave donor hospitals *an entire year* to complete this process, until January of 2024.

16. Through this process, in approximately December of 2023, Mr. Hallmon was first informed over the phone by MUSC that he was receiving an eight-month wait time adjustment. That is, Mr. Hallmon was first added to UNOS's kidney waitlist through MUSC on or about the year 2020. But absent Defendants' use of the race-based coefficient, UNOS found that Mr. Hallmon would have qualified to join the waitlist eight months earlier. After significant delay, Mr.

---

[1] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

3

Hallmon finally received a kidney transplant in April of 2024.[2]

17. Defendants' discrimination against Black Americans by use of the race-based coefficient, at minimum, had a detrimental impact on Mr. Hallmon's life through the additional delay period, which resulted in debilitating dialysis treatments and ultimately forced Mr. Hallmon into a career change resulting in vastly lower pay.

## PARTIES

18. Mr. Hallmon is an individual residing in Columbia, South Carolina.

19. Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

20. MUSC is a state hospital engaged in the provision of health care services and located in Charleston, South Carolina.

21. Dr. Rao is an individual who is employed by MUSC as its medical Director of Transplant Nephrology. Upon information and belief, Dr. Rao resides in Charleston, South Carolina.

## JURISDICTION AND VENUE

22. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Hallmon asserts a federal cause of action alleging racial discrimination. This Court further has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

---

[2] An earlier lab result from December of 2018 may have qualified Mr. Hallmon to join the waitlist; however, UNOS does not appear to have credited that lab result as qualifying. In this regard, in December of 2018, Mr. Hallmon's eGFR was measured at 24 ml/min after the race-based coefficient was applied, which depending upon the particular coefficient used, could indicate that Mr. Hallmon's race-neutral calculation was at 20 ml/min or below at this time.

4

23. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Mr. Hallmon has been affected by Defendants' unlawful policies and procedures within this District. Each of the Defendants have transacted with Mr. Hallmon within the District; thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

24. This Court has personal jurisdiction over UNOS because UNOS conducts operations within South Carolina by virtue of its management of the kidney donor list for all patients residing within the State, including Mr. Hallmon. UNOS makes decisions as to which patients residing in South Carolina will be offered donor kidneys.

25. This Court has personal jurisdiction over MUSC because MUSC maintains its principal place of business within the State, and harmed Mr. Hallmon by virtue of the unlawful conduct alleged herein within this State.

26. This Court has personal jurisdiction over Dr. Rao because she lives within the State and harmed Mr. Hallmon by virtue of the unlawful conduct alleged herein within this State.

**GENERAL ALLEGATIONS**

**A.    The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys.**

27. In 1984, Congress passed the National Organ Transplant Act ("NOTA"), creating the Organ Procurement and Transport Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Per NOTA, this registry was to be operated by a private, non-profit organization under federal contract.[3]

28. Since that time, UNOS has acted as that private, non-profit organization which operates the OPTN. As its website declares, UNOS "[m]anag[es] the national transplant waiting

---

[3] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

5

list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease.

29. To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals, and receive a referral from his physician. In this way, transplant hospitals like MUSC serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

30. Transplant hospitals such as MUSC serve as UNOS's agents in dealing with kidney disease patients. That is, UNOS is obligated to manage the national kidney waitlist, but puts policies in place where it does not allow kidney disease patients to apply for inclusion on the kidney transplant waitlist directly through UNOS. Again, kidney disease patients must be referred by an approved transplant hospital.

31. MUSC's kidney transplant department is and has at all relevant times been directed by Dr. Rao, and under Dr. Rao's authority, MUSC applied the race-based coefficient to Black patients' eGFR scores, and refused to refer Black patients to UNOS's national kidney waitlist because application of the race-based coefficient raised their eGFR scores above 20 ml/min, when the patients would have otherwise had eGFR scores at or below 20 ml/min, and been referred to the waitlist.

32. MUSC's application of the race-based coefficient in this manner delayed referral of Mr. Hallmon both to transplant hospitals and the national kidney waitlist.

33. While UNOS knew its transplant hospitals, including MUSC as directed by Dr. Rao, were using the race-based coefficient, and did nothing to stop it for over two decades, application of the race-based coefficient was not mandated by an express written policy.

34. At all times, Dr. Rao had the authority to mandate race-neutral calculation and

6

reporting of eGFR scores at MUSC, but failed to do so.

35. The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores, into the UNet software, which tracks patient medical information and wait time.

36. UNOS had knowledge at all relevant times that its transplant hospitals, including MUSC, were applying the race-based coefficient to Black patients' eGFR scores, delaying their accrual of wait time, and thus that its UNet program was filled with race-based coefficient-impacted wait time calculations, including for Mr. Hallmon.

37. Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, including entered eGFR scores and wait time calculations, and generates a list of potential matches, ranking the potential matches on the national kidney waitlist. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

38. Upon information and belief, the primary factor considered by UNet's algorithm to rank candidates for potentially compatible kidneys is a patient's accrued wait time. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to wait time. A disadvantage for Black patients in their calculation of wait time thus seriously prejudices their chances of being awarded a donor kidney.

**B.     The Defendants applied a racially discriminatory coefficient to Black patients' eGFR scores.**

39. UNOS is responsible for enacting policy that determines which patients receive which donor kidneys. In this regard, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

7

40. For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans. Both of the commonly administered eGFR tests included the race-based coefficient, one of 16% and the other 21%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems.

41. As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient artificially inflated their eGFR scores *close* to 20 ml/min, *above* 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

42. This practice led to many Black kidney disease patients never qualifying for wait time by eGFR score because their addition to the waitlist was delayed until the patients had to start of dialysis (which is recommended when kidney function falls below 15 ml/min).

43. UNOS's agent transplant hospitals, including MUSC, also had a policy of applying the race-based coefficient to Black patients' eGFR scores. Because the transplant hospitals are required by UNOS to measure and provide patients' eGFR scores, this conduct by the transplant hospitals is within the scope of their agency.

44. UNOS at all times knew its agent transplant hospitals were using the race-based coefficient, and despite its authority to ban the practice, as evidenced by the rules passed in 2022 and 2023, discussed below, did nothing to stop the transplant hospitals for more than two decades.

45. UNOS knew at all relevant times that the transplant hospitals' use of the race-based coefficient resulted in delayed referrals and accrual of wait time for Black kidney disease patients,

transplant hospitals entering the impacted data into UNOS's UNet program. Knowing that its UNet program was full of race-based coefficient-impacted wait time data, UNOS used that race-based coefficient-impacted data when running its algorithm to determine to whom to award a kidney.

46. The above shows a policy and practice of use of the race-based coefficient directly by UNOS. Again, UNOS's UNet system was full of eGFR scores that incorporate the race-based coefficient, the race-based coefficient impacted UNOS's wait time calculations, and those weight time calculations are weighted heavily within the UNet algorithm in determining which patients would be awarded a donor kidney. Moreover, UNOS at all times knew that its UNet system was full of race-based coefficient-impacted data, such that UNOS's decision use that data in its algorithm was a conscious decision to itself use the race-based coefficient.

47. UNOS is also liable for the transplant hospitals' use of the race-based coefficient. UNOS enacted policies and bylaws that required transplant hospitals to act as its agents in referring patients to the waitlist and gathering relevant medical information from patients, tasks UNOS itself would otherwise be required to do. UNOS knew for decades that its transplant hospitals were using the race-based coefficient on UNOS's behalf, could have banned transplant hospitals from doing so, but failed to do so, despite knowledge that the race-based coefficient is discriminatory against Black patients.

48. MUSC has applied the race-based coefficient to eGFR scores and entered the modified eGFR scores into UNOS's UNet system. MUSC also acts as UNOS's gatekeeper to the national kidney waitlist, refusing to make referrals for Black kidney disease patients that would have a qualifying eGFR score but for use of the race-based coefficient. This practice delayed Mr. Hallmon from being added to the waitlist and accruing wait time.

49. MUSC's policy and practice of use of the race-based coefficient was directed by

Dr. Rao, who was not expressly bound by UNOS to use the race-based coefficient. In sum, both UNOS and its transplant hospitals (including certain leadership like Dr. Rao) use the race-based coefficient and are joint tortfeasors.

50. There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

51. This is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

52. Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney. Indeed, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

53. The above-described practices have resulted in non-Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

C. **Even after UNOS admitted that the race-based coefficient discriminates against Black Americans, Defendants refused to timely address the problem**.

54. In June of 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through

10

transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

55.     In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[4]

56.     UNOS posted the following passage on its website:



**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

57.     UNOS's policy officially changed on July 27, 2022, with UNOS's prior policy allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

---

[4] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

11

58. Nonetheless, at this time, MUSC, under Dr. Rao's leadership, did nothing to reassess Mr. Hallmon's wait time calculation; nor did MUSC or Dr. Rao inform Mr. Hallmon that the race-based coefficient was applied to his eGFR scores.

59. This lack of diligence was consistent at UNOS, which continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

60. On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients are eligible for a wait time adjustment, and to request said adjustments with UNOS within a year, i.e., by January of 2024.

61. While this adjustment in policy rightfully acknowledged the racially discriminatory nature of the race-based coefficient, it lacked the requisite urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, including Mr. Hallmon, the policy change was too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to utilize the old, improperly calculated wait times when awarding kidneys.

62. As to Mr. Hallmon specifically, MUSC sent him in October of 2023 the first type of notification described in paragraph 57, *supra*—that he would be considered for a wait time adjustments if the race-based coefficient delayed his accrual of wait time. Oddly, he received a similar letter in December of 2023. Neither of these letters actually confirmed whether Mr.

12

Hallmon was entitled to a wait time adjustment.

63. This lack of prompt attention to adjusting its patient wait times was under the supervisory authority of Dr. Rao.

64. It was not until later in December of 2023 that Mr. Hallmon received confirmation from MUSC that he would be receiving a wait-time adjustment. He received this confirmation via a phone call with a representative of MUSC.

**D.** **As a result of not being awarded a kidney in the transplant market earlier, Mr. Hallmon has suffered significant harms**.

65. Had the race-based coefficient not been applied to Mr. Hallmon's eGFR score, he would have been eligible to join the waitlist at least eight months earlier. That the discrepancy in wait time disadvantaged Mr. Hallmon's consideration for a kidney is evidenced by the fact that shortly after he received a wait time adjustment, Mr. Hallmon was offered a kidney.

66. Mr. Hallmon was first placed on the waitlist at MUSC in 2020. Additionally, in 2020, Mr. Hallmon's kidney disease worsened to the point he was forced to start dialysis.

67. Since that time and until he received a kidney transplant, Mr. Hallmon was forced to receive dialysis at his home every night starting at 6:00 PM. The treatment is unpleasant and drains Mr. Hallmon's physical and mental energy.

68. Mr. Hallmon was forced to quit his six-figure job and accept a lower-paying job.

69. Mr. Hallmon met his future wife while working abroad in former Yugoslavia. After they returned to the United States and Mr. Hallmon was diagnosed with kidney disease, the demands of his dialysis treatment rendered him unable to travel abroad. Though his wife and daughter return to former Yugoslavia on a semi-regular basis to visit his wife's family, Mr. Hallmon has never been able to join in the trips. Missing out on this time with his family causes him great sadness and loneliness.

13

70. Mr. Hallmon's rigorous dialysis regimen has drained his energy and consumed so much of his time that his intimacy with his wife has depleted. Mr. Hallmon is not able to spend as much time enjoying his wife's company, congress, and love. He is also unable to embark on cruises with his wife—a regular feature of his marriage prior to enduring extended time waiting for a kidney because of the race-based coefficient.

71. Mr. Hallmon's kidney disease has required Mr. Hallmon to go through a litany of expensive, unpleasant medical procedures, resulting in physical pain, an inability to work or enjoy life, and severe emotional distress.

72. Even though Mr. Hallmon survived his kidney transplant, he must still contend with the time he will never get back.

73. All of this that occurred during the additional wait time imposed upon Mr. Hallmon because of the race-based coefficient would have been avoided had Defendants not discriminated against Mr. Hallmon.

**FIRST CAUSE OF ACTION**
**(Violation of Title VI of the Civil Rights Act of 1964—Against UNOS and MUSC)**

74. Mr. Hallmon re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

75. UNOS and MUSC receive significant financial assistance from the Federal government.

76. In this regard, approximately 10% of UNOS's budget is provided by the Federal government, in accordance with NOTA's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

77. Moreover, UNOS's audited financial statements describe this Federal government payment as a "Grant" and include a corresponding "Federal Assistance Lending Number." Upon information and belief, this number relates to Federal government "Assistance Listings" which, pursuant to the Federal government-run SAM.gov, "are detailed public descriptions of federal programs that provide grants, loans, scholarships, insurance, and other types of assistance awards."

78. The legislative history also confirms that the legislative intent behind the payments was not to purchase anything from UNOS, but instead to provide financial assistance:

- Rep. Pallone stated, "this legislation will provide critical funding to ensure the OPTN has resources it needs to continue to perform its valuable services to our Nation."154 Cong. Rec. H8668-01, 2008 WL 4329712, at *H8669.

- Rep. Burgess stated, "This bill increases the authorized funding for the Organ Procurement and Transplantation Network, which has not been increased since 1984. The Organ Procurement and Transplantation Network provides coordination between individuals in need of an organ transplant and donor organs made available from deceased donors. I support the increased authorization levels for the program, which currently represent only 7 percent of the operating cost for this valuable resource." *Id.* at *H8670.

- Rep. Jackson-Lee stated, "It is time to help patients, all across the country, in need of lifesaving transplants of not just the kidney, but also heart, liver, lung and other vital organs." *Id.*

79. MUSC receives significant financial assistance from the Federal government and its programs, funding both patient care and other related operations.

80. Defendants have engaged in racial discrimination. As alleged in detail above, Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients', including Mr. Hallmon's, eGFR scores, with UNOS adopting, encouraging, and implementing the race-based coefficient, and MUSC applying the race-based coefficient directly, thus delaying Mr. Hallmon's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

81. Defendants further knowingly input and used these modified wait times for Black

15

patients in UNOS's Unet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, both Defendants failed to take prompt action to ensure Mr. Hallmon's wait time was recalculated.

82. The damages resulting from this racial discrimination include but are not limited to depriving and/or delaying Mr. Hallmon's award of a donor kidney. This discrimination also caused Mr. Hallmon to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs, and costs resulting from cramping, and lost wages stemming from a forced career change because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of 42 U.S.C. § 1983—Against Dr. Rao)**

83. Mr. Hallmon re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

84. This claim is brought against Dr. Rao in her individual capacity.

85. Dr. Rao deprived Mr. Hallmon of a right secured by the United States Constitution, i.e., his right to be free from race-based discrimination and to receive the same needed medical care as non-Black patients; particularly to receive fair consideration for a donor kidney.

86. Dr. Rao is the Director of Transplant Nephrology at MUSC. Transplant nephrology involves, among other things, screening candidates for kidney transplants, and registering qualifying candidates on UNOS's waitlist. Dr. Rao thus had authority as Director to decide how to make this referral determination, or in other words, whether to use the race-based coefficient to the detriment of Black patients when determining whether their eGFR falls at or below 20 ml/min.

87. Dr. Rao also had authority to set policy in regard to whether race-based coefficient

16

impacted-data was entered into UNet, and decide what steps MUSC would take to adjust wait times after UNOS banned use of the race-based coefficient.

88. Dr. Rao acted under the color of state law, setting policy and practice for MUSC, a hospital that claims to be an instrumentality of the State of South Carolina.

89. Dr. Rao's actions in subjecting Mr. Hallmon to the race-based coefficient were thus taken under the apparent authority of the State of South Carolina and under the color of state law.

90. Dr. Rao can claim no qualified immunity. Such racial classifications have been held to be presumptively invalid in Supreme Court jurisprudence for decades. *See Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.") (internal quotation marks omitted). Again, the Reconstruction Amendments, passed in 1865, were primarily a response to racial classifications made to the detriment of Black Americans, like is at issue here.

91. The damages resulting from Dr. Rao's violation of Section 1983 include but are not limited to depriving and/or delaying Mr. Hallmon's award of a donor kidney. This discrimination also caused Mr. Hallmon to incur economic injuries, including but not limited to, continued medical costs resulting from dialysis and other kidney-related care, and lost wages stemming from a forced career change because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

92. The violation of Section 1983 caused additional damages to Mr. Hallmon including but not limited to pain and suffering, severe emotional distress resulting in depression and accompanying stress about the future, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## THIRD CAUSE OF ACTION
### (Outrage—Against UNOS and Dr. Rao)

93. Mr. Hallmon re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

94. UNOS's and Dr. Rao's conduct, as described in this Complaint, can only be described as so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

95. UNOS's and Dr. Rao's extreme and outrageous conduct, intentionally and/or recklessly caused Mr. Hallmon the harms and damages described herein, including severe emotional distress.

96. The above-described outrage caused additional damages including, but not limited to, pain and suffering and severe emotional distress resulting in a looming fear of death and constant fatigue, the inability to travel, and the loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Hallmon prays for relief against Defendants as follows:

1. For damages in compensation for the economic, medical, personal injuries, loss of consortium, pain and suffering, and emotional distress sustained by the Mr. Hallmon in an amount to be determined by evidence;

2. For punitive damages in an amount according to proof;

3. For a jury to decide all issues of fact;

4. For pre-judgment interest on all damages awarded by this Court;

5. For reasonable attorneys' fees and costs of suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

<div style="margin-left: 50%;">

s/ Julie L. Moore
Julie L. Moore (Fed. Bar No. 11138)
C. Wilson Daniel (Fed. Bar No. 13579)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Facsimile: (843) 720-2047
jmoore@duffyandyoung.com
wdaniel@duffyandyoung.com

and

George Laiolo
Matthew L. Venezia
ELLIS GEORGE, LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Main 415.391.7100
Fax 310.275.5697
glaiolo@ellisgeorge.com
mvenezia@ellisgeorge.com
*Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiff*

</div>

July 23, 2024
Charleston, South Carolina