IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Randolph Hallmon, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>United Network for Organ Sharing; )<br>The Medical University of South )<br>Carolina; and Dr. Vinaya Rao, )<br>)<br>Defendants. )<br>_____) | Civil Action No. 2:24-cv-4100-BHH<br><br>**<u>ORDER</u>** |

Plaintiff Randolph Hallmon ("Plaintiff" or "Hallmon") filed this action in July of 2024, alleging the following claims: (1) violation of Title VI of the Civil Rights Act of 1964 against Defendants United Network for Organ Sharing ("UNOS") and The Medical University of South Carolina ("MUSC"); (2) violation of 42 U.S.C. § 1983 against Dr. Vinaya Rao ("Rao"); and (3) outrage against Defendants UNOS and Rao.  (ECF No. 1.)  On August 15, 2024, Defendant UNOS filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on September 24, 2024, Defendant Rao also filed a motion to dismiss pursuant to Rule 12(b)(6).[1]  (ECF Nos. 11, 24.)  The motions have been fully briefed, and the matters are ripe for review.  (ECF Nos. 18, 23, 28.)  For the reasons set forth herein, the Court denies both motions.

**<u>BACKGROUND</u>**

In 1984, Congress passed the National Organ Transplant Act ("NOTA"), which created the Organ Procurement and Transport Network ("OPTN") to maintain a national

---

[1] Defendant MUSC filed an answer to Plaintiff's complaint on September 5, 2024.  (ECF No. 20.)

registry for organ matching.  (ECF No. 1 ¶ 27.)  In accordance with NOTA, UNOS has acted as the private, non-profit organization tasked with operating the OPTN and managing the national transplant waiting list.  (*Id.* ¶¶ 27-29.)  To be placed on the national kidney waitlist, a patient must visit a transplant hospital, such as Defendant MUSC, and must be referred for transplant by the transplant hospital.  (*Id.* ¶¶ 29-30.)  MUSC's transplant department is directed by Defendant Rao.  (*Id.* ¶ 31.)

In his complaint, Plaintiff asserts that "[f]or more than two decades, UNOS and its affiliated transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients," and he contends that the race-based coefficient delayed Black kidney disease patients, including him, from being added to the kidney transplant waitlist and resulted in longer waiting times for Black kidney transplant candidates. (ECF No. 1 at ¶ 1.) Plaintiff contends that "[u]se of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies" and was instead based on a "defunct, eugenics-style racial stereotype" that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than non-Black individuals.  (*Id.* ¶ 2.)

Plaintiff was diagnosed with kidney disease in 2020 and began dialysis in 2020.  (*Id.* ¶¶ 5-6.)  And at some point in 2020, Plaintiff was placed on the kidney waitlist at MUSC. (*Id.* ¶ 10.)  Plaintiff asserts that "UNOS and MUSC now admit that these [eGFR] scores were artificially adjusted in a racist manner from the beginning," and he further asserts that in June of 2022, UNOS approved a measure to require hospitals to use a race-neutral calculation when estimating an individual's kidney function.  (*Id.* ¶¶ 12, 13 (quotation marks omitted).)  Plaintiff then states that, "[d]espite prohibiting future use of the race-based

coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist." (*Id.* ¶ 14.) Plaintiff also states that in January of 2023, UNOS instructed MUSC to notify Black candidates of the policy change and to investigate whether Black Americans were eligible for a modification to the wait time, but UNOS gave donor hospitals like MUSC an entire year to complete the process, or until January of 2024, and as such, failed to timely address the issue. (*Id.* ¶¶ 15, 54-61.) Plaintiff asserts that "[t]he lack of prompt attention to adjusting its patient wait times was under the supervisory authority of Dr. Rao." (*Id.* ¶ 63.)

According to Plaintiff's complaint, he was first notified by phone in December of 2023 that he was receiving an eight-month adjustment to his wait time. (*Id.* ¶¶ 16, 62-64.) Plaintiff states: "That is, Mr. Hallmon was first added to UNOS's kidney waitlist through MUSC on or about the year 2020. But absent Defendants' use of the race-based coefficient, UNOS found that Mr. Hallmon would have qualified to join the waitlist eight months earlier." (*Id.*) Plaintiff ultimately received a kidney transplant in April of 2024. (*Id.* ¶ 16.)

Plaintiff contends that transplant hospitals, such as MUSC, "serve as gatekeepers to patients seeking to be placed on the national kidney waitlist," and he further contends that transplant hospitals like MUSC "serve as UNOS's agents in dealing with kidney disease patients." (*Id.* ¶¶ 29-30.) According to Plaintiff, even though UNOS knew its transplant hospitals, including MUSC (as directed by Dr. Rao), were using the race-based coefficient, its use was not mandated by an express policy, and Plaintiff asserts that Dr. Rao at all times "had the authority to mandate race-neutral calculation and reporting of eGFR scores at MUSC, but failed to do so." (*Id.* ¶¶ 33-34.) Plaintiff further asserts that

3

Rao "had the authority to mandate race-neutral calculation and reporting of eGFR scores at MUSC, but failed to do so." (*Id.* ¶ 34.)  Plaintiff also states that UNOS knew that the transplant hospitals' use of the race-based coefficient resulted in delayed referrals and longer wait times for Black kidney transplant patients but still used the race-based coefficient-impacted data when running its alogorithm to determine who would receive a kidney.  (*Id.* ¶ 45.)

As a first cause of action against Defendants UNOS and MUSC, Plaintiff alleges violation of Title VI of the Civil Rights Act.  Specifically, Plaintiff alleges that UNOS and MUSC receive significant financial assistance from the federal government and that they both engaged in racial discrimination by allowing and encouraging the use of the race-based coefficient to artificially inflate Black patients' eGFR scores, including Plaintiff's score.  (*Id.* ¶¶ 74-80.)

As a second cause of action against Defendant Rao, Plaintiff alleges violation of 42 U.S.C. § 1983, asserting that Rao deprived Plaintiff of his right to be free from race-based discrimination and to receive the same medical treatment as a non-Black patient.  (*Id.* ¶¶ 83-85.) Plaintiff asserts that Rao "acted under color of state law, setting policy and practice for MUSC, a hospital that claims to be an instrumentality of the State of South Carolina." (*Id.* ¶ 88.)  According to Plaintiff, Rao cannot claim qualified immunity because such racial classifications have been held to be presumptively invalid for decades.  (*Id.* ¶ 90.)

Lastly, as a third cause of action against Defendants UNOS and Rao, Plaintiff alleges a claim for outrage, also known as intentional infliction of emotional distress, pursuant to South Carolina law.  Plaintiff states that these Defendants' conduct "can only be described as so outrageous in character, and so extreme in degree, as to go beyond

4

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (*Id.* ¶ 94.)

In his prayer for relief, Plaintiff seeks, *inter alia*, actual damages and punitive damages, along with attorney's fees and costs. (*Id.* at 18.)

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court held in *Bell Atl. Corp. v. Twombly*, the pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544, 555 (2007)). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* When considering a motion to dismiss, the court must accept as true all of the factual

allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "In considering a Rule 12(b)(6) motion, the Court may also 'properly take judicial notice of matters of public record,' 'consider documents attached to the complaint,' and consider documents attached to the motion to dismiss 'so long as they are integral to the complaint and authentic.'" *E. Brdige Lofts Prop. Owners Ass'n, Inc. v. Crum & Forster Specialty Ins. Co.*, No. 2:14-cv-2567-RMG, 2015 WL 12831695, at *2 (D.S.C. Mar. 12, 2015) (quoting *Sec'y of State for Deference v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).

## DISCUSSION

### I.     Defendant UNOS's Motion to Dismiss

In its motion to dismiss, UNOS seeks an order dismissing Plaintiff's claims against it for violation of Title VI and outrage for several reasons. First, UNOS asserts that Plaintiff's Title VI claim is subject to dismissal based on Plaintiff's failure to allege intentional discrimination and his failure to plausibly plead that UNOS receives federal financial assistance. (ECF No. 11-1 at 6-12.) UNOS further asserts that Plaintiff's Title VI claim is untimely. (*Id.* at 12-13.) With respect to Plaintiff's claim for outrage, UNOS asserts that Plaintiff's complaint does not contain sufficient factual allegations to establish that UNOS intentionally discriminated against Plaintiff. (*Id.* at 13-15.) Lastly, UNOS asks the Court to strike Plaintiff's request for punitive damages because (1) punitive damages are not available for private actions under Title VI and (2) the Charitable Funds Act precludes recovery of punitive damages against a nonprofit corporation like UNOS. (*Id.* at 15-16.)

In response to UNOS's motion, Plaintiff asserts that his complaint sufficiently alleges intentional discrimination on the part of UNOS. (ECF No. 18 at 9-15.) To that end, Plaintiff states: "Plaintiff has alleged that UNOS knew the race-based coefficient was in widespread

use for decades, that UNOS enacted no policy to address the issue, and that UNOS itself knowingly used race-based coefficient-modified data in its UNet algorithm when deciding to whom to award kidneys, to the detriment of Black candidates." (*Id.* at 13.) Additionally, Plaintiff asserts that UNOS's reliance on the "Prior OPTN Kidney Policy," a copy of which UNOS attached to its motion, is improper. (*Id.* at 13-14.) Next, Plaintiff asserts that his complaint adequately alleges that UNOS accepts federal funding and that UNOS's arguments to the contrary ignore the nature of the federal assistance received by UNOS. (*Id.* at 16-20.)

With regard to his claim for intentional infliction of emotional distress, Plaintiff asserts that his complaint adequately pleads that "UNOS intentionally used the race-based coefficient, artificially increasing his eGFR score and prejudicing his ability to receive a kidney, based on the defunct stereotype that Black people have greater muscle mass." (*Id.* at 20.)

As to the timeliness of his claims, Plaintiff takes issue with UNOS's adoption of a one-year statute of limitations from South Carolina's Human Affairs Law, and Plaintiff asserts that the Court should apply South Carolina's three-year statute of limitations for personal injury actions to discrimination-based claims like his. (*Id.* at 21-22.) Nevertheless, Plaintiff asserts that, even if a one-year statute of limitations applies, his claim is timely under the discovery rule because "Plaintiff was never notified that his registration on the national kidney waitlist was or may have been delayed, or even that the race-based coefficient was potentially used to modify his eGFR scores, until October 2023." (*Id.* at 22.)

Lastly, Plaintiff asserts that the Charitable Funds Act does not limit the remedies available for his claims because "the Charitable Funds Act places no cap on actual

damages recoverable for the commission of intentional torts," and because the Charitable Funds Act only limits damages consistent with the caps set forth in the South Carolina Tort Claims Act ("SCTCA"). (*Id.* at 24-25.) Plaintiff also states that he does not seek punitive damages in connection with his claim under Title VI; instead, his claim for punitive damages relates only to his claim for intentional infliction of emotional distress. (*Id.* at 25.)

After careful review, the Court finds that UNOS is not entitled to dismissal of Plaintiff's claims against it at this time. First, the Court notes that many of UNOS's arguments ignore the proper standard of review for a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In other words, many of UNOS's arguments overlook the fact that the Court must accept as true all well-pleaded factual allegations contained in the complaint when considering a motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

First, with respect to UNOS's assertion that Plaintiff's complaint fails to allege that UNOS engaged in intentional discrimination, the Court finds that even a cursory review of Plaintiff's complaint reveals numerous factual allegations related to UNOS's alleged intentional discrimination. Plaintiff alleges, among other things, that:

> 33. While UNOS knew its transplant hospitals, including MUSC as directed by Dr. Rao, were using the race-based coefficient, and did nothing to stop it for over two decades, application of the race-based coefficient was not mandated by an express written policy.
>
> . . .
>
> 36. UNOS had knowledge at all relevant times that its transplant hospitals, including MUSC, were applying the race-based coefficient to Black patients' eGFR scores, delaying their accrual of wait, and thus that its U Net program was filled with race-based coefficient-impacted wait time calculations, including for Mr. Hallmon.

> . . .
>
> 44. UNOS knew at all times its agent hospitals were using the race-based coefficient, and despite its authority to ban the practice, as evidenced by the rules passed in 2022 and 2023, discussed below, did nothing to stop the transplant hospitals for more than two decades.
>
> 45. UNOS knew at all times that the transplant hospitals' use of the race-based coefficient resulted in delayed referrals and accrual of wait time for Black kidney disease patients, transplant hospitals entering the impacted data into UNOS's UNet program. Knowing that its UNet program was full of race-based coefficient-impacted wait time data, UNOS used that race-based coefficient-impacted data when running its alogrithm to determine to whom to award a kidney.
>
> 46. The above shoes a policy and practice of use of the race-based coefficient directly by UNOS. . . . Moreover, UNOS at all times knew that its UNet system was full of race-based coefficient-impacted data, such that UNOS's decision [to] use that data in its algorithm was a conscious decision to itself use the race-based coefficient. . .
>
> 47. . . . UNOS knew for decades that its transplant hospitals were using the race-based coefficient on UNOS's behalf, could have banned transplant hospitals from doing so, but failed to do so, despite knowledge that the race-based coefficient is discriminatory against Black patients.

(ECF No. 1 ¶¶ 33, 36, 44-47.) Furthermore, Plaintiff specifically pleads that UNOS has admitted that the use of a race-based coefficient was racially discriminatory. (*See id.* ¶¶ 12-15; 55-57.)

Ultimately, accepting Plaintiff's factual allegations as true, the Court finds that Plaintiff's complaint more than adequately alleges intentional discrimination on the part of UNOS.[2] Furthermore, and in the same vein, the Court finds that Plaintiff's complaint

---

[2] To the extent UNOS urges the Court to consider the "Prior OPTN Kidney Policy" in connection with its motion to dismiss, the Court declines to do so. (ECF No. 11-1 at 8; ECF No. 11-2.) First, the Court notes that this document does not appear to be integral to Plaintiff's complaint, insofar as Plaintiff specifically alleges that "application of the race-based coefficient was not mandated by an express written policy." (ECF No. 1 ¶ 33.) Furthermore, the Court agrees with Plaintiff that it would be inappropriate at this stage for the Court to rely on this single policy document to determine, as a factual matter, that Plaintiff's claim fails as a matter

contains sufficient factual allegations of extreme and outrageous conduct to plausibly plead a claim for intentional infliction of emotional distress under South Carolina law. *See Bergstrom v. Palmetto Health All.*, 358 S.C. 388, 401, 596 S.E.2d 42, 48 (2004) (citing *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776, 778 (1981) (setting forth the elements of a claim for intentional infliction of emotional distress). Accordingly, the Court declines to dismiss Plaintiff's claims against UNOS based on a failure to plead intentional discrimination or intentional, outrageous conduct.

Next, the Court also is not convinced by UNOS's argument that Plaintiff has failed to plausibly plead that UNOS receives federal financial assistance, as Plaintiff's complaint plainly states that "UNOS and MUSC receive significant financial assistance from the Federal government." (ECF No. 1 ¶ 75.) Plaintiff then expounds upon this statement with additional factual allegations, asserting that "approximately 10% of UNOS's budget is provided by the Federal government" and that certain federal contracts "were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government." (*Id.* ¶ 76.) Plaintiff further alleges that "UNOS's audited financial statements describe this Federal government payment as a 'Grant' and include a corresponding 'Federal Assistance Lending Number,'" and Plaintiff points to the legislative history in support. (*Id.* ¶ 77.)

Here again, the Court finds that Plaintiff's allegations, which the Court must accept as true at this time, are more than sufficient to adequately allege that UNOS accepts federal financial assistance, and more is not required from Plaintiff at this time. Whether

---

of law.

Plaintiff can ultimately prove these allegations, of course, is a question for another time and is better left for consideration on a motion for summary judgment.

The Court also declines to dismiss Plaintiff's claims against UNOS based on timeliness. First, the Court notes that courts ordinarily do not consider an affirmative defense, such as the statute of limitations, when a motion is filed pursuant to Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Second, the Court finds that, at least at this early stage in the litigation, regardless of whether a one-year or a three-year statute of limitations applies, Plaintiff's claims appear to be timely in light of the discovery rule, as Plaintiff's complaint specifically alleges that it was not until October of 2023 that he first received notification "that he would be considered for a wait time adjustment[ ] if the race-based coefficient delayed his accrual of wait time," and it was not until December of 2023 that he "received confirmation from MUSC that he would be receiving a wait-time adjustment." (ECF No. 1 ¶¶ 62, 64.) The Court therefore declines to dismiss Plaintiff's claims based on the statute of limitations at this time; Defendant, of course, may raise this issue again on a motion for summary judgment after the parties have had the benefit of discovery.

Lastly, with respect to UNOS's request that the Court strike Plaintiff's request for punitive damages, the Court reiterates that Plaintiff does not seek punitive damages in connection with his Title VI claim. Rather, Plaintiff has clarified that his request for punitive damages pertains only to his claim for intentional infliction of emotional distress. (*See* ECF No. 25 at 18.)

Next, however, as to Defendant's assertion that Plaintiff may not recover punitive damages against it because it is a 501(c)(3) not-for-profit charitable organization subject

11

to the immunity provisions of the South Carolina Solicitation of Charitable Funds Act, *see* S.C. Code § 33-56-180(A), the Court declines to decide this issue at this time. Rather, the Court finds it appropriate to reserve its ruling on this issue until the parties have the benefit of discovery and to permit the parties an additional opportunity to fully brief the intricacies of the interplay between the Charitable Funds Act and the SCTCA.

For the foregoing reasons, the Court denies UNOS's motion to dismiss.

## II.     Defendant Rao's Motion to Dismiss

In her motion to dismiss, also filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Rao asserts that Plaintiff's claims against her for violation of § 1983 and intentional infliction of emotional distress are based on conclusory allegations that Rao implemented a policy in her role as Director of Transplant Nephrology at MUSC that required MUSC to use a race-based coefficient in calculating a kidney patient's eGFR score. According to Rao, even accepting Plaintiff's allegations as true, Plaintiff's § 1983 claim nevertheless fails because Rao is entitled to qualified immunity for the alleged actions or inactions asserted in the complaint. (ECF No. 24-1 at 2.) Specifically, Rao asserts that a reasonable person in Rao's position would not have known that her actions violated Plaintiff's constitutional right. (*Id.* at 3-8.)

Second, with respect to Plaintiff's claim for intentional infliction of emotional distress, Rao asserts that Plaintiff's allegations against her do not rise to the level of conduct that is atrocious or so extreme and outrageous as to exceed all possible bounds of decency. (*Id.* at 8-9.)

In response to Rao's motion, Plaintiff asserts that Rao is "not entitled to qualified immunity because Dr. Rao implemented a facially discriminatory policy that treated patients

disparately based solely on their race, and the implementation of a race-based facially discriminatory policy is a clear violation of the foundational and age-old Constitutional right to equal protection under the law."  (ECF No. 28 at 3 (citations omitted).)  Additionally, Plaintiff asserts that a decision on Rao's qualified immunity defense would be premature at the motion to dismiss stage.

Next, as to her claim for intentional infliction of emotional distress, Plaintiff asserts that it is not relevant whether other medical institutions engaged in the same conduct as Rao, and Plaintiff further asserts that Rao's argument ignore the actual allegations of the complaint, which satisfy the pleading standard for plausibly stating a claim for intentional infliction of emotional distress under South Carolina law.

After careful consideration, the Court finds that Plaintiff's complaint includes sufficient factual allegations, which are accepted as true when considering Rao's motion to dismiss, to plausibly allege that Defendant Rao violated Plaintiff's well-established constitutional rights.  Furthermore, the Court agrees with Plaintiff that it would be premature to decide Rao's entitlement to qualified immunity at this early stage in the proceedings. *See Riddick v. Barber*, 109 F.4th 639, 650, n.5 (4th Cir. 2024) (quoting *Alford v. Cumberland Cnty.*, No. 06-1569, 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2007) ("[Q]ualified immunity typically is best addressed 'at the summary judgment stage after the facts have been developed through discovery.'"); *see also Owens v. Balt. City State's Atty's Off.*, 767 F.3d 379, 396 (4th Cir. 2014) (explaining that qualified immunity defenses are "usually not successful" at the motion to dismiss stage, where a plaintiff need only "present a claim that is plausible on its face").  Accordingly, the Court declines to dismiss Plaintiff's § 1983 claim against Rao on the basis of qualified immunity.

Next, as to Plaintiff's claim for intentional infliction of emotional distress, the Court finds the allegations of Plaintiff's complaint sufficient to state a plausible claim against Rao under South Carolina law. *See Bergstrom v. Palmetto Health All.*, 358 S.C. 388, 401, 596 S.E.2d 42, 48 (2004) (citing *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776, 778 (1981) (setting forth the elements of a claim for intentional infliction of emotional distress). Accordingly, the Court declines to dismiss Plaintiff's claim for intentional infliction of emotional distress against Rao at this time.

For the foregoing reasons, the Court denies Defendant Rao's motion to dismiss.

## **CONCLUSION**

For the reasons set forth above, the motions to dismiss filed by Defendants UNOS and Rao (ECF Nos. 11 and 24) are hereby **DENIED**.

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

March 24, 2025
Charleston, South Carolina